IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHERYL THORESON,

                                                  OPINION and ORDER

                 Plaintiff,

                                                  11-cv-19-bbc

    v.

WOODSIDE RANCH, LLC, d/b/a
WOODSIDE RANCH RESORT AND CONFERENCE CENTER

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Cheryl Thoreson is suing defendant Woodside Ranch, LLC for injuries she sustained after falling off a horse owned by defendant. Plaintiff contends that defendant was negligent in adjusting the saddle on the horse she was riding. Defendant has moved for summary judgment on the ground that the Wisconsin Equine Immunity Statute, Wis. Stat. § 895.481, applies to this case. Plaintiff argues that the immunity statute does not apply because defendant's negligence is not "an inherent risk of equine activity" within the meaning of the statute and that defendant's actions fall into an exception under the statute related to "faulty equipment."

1

I conclude that a sponsor's failure to properly adjust a saddle (1) is an inherent risk of equine activity under Wis. Stat. § 895.481 and (2) does not fall within the meaning of faulty equipment. Accordingly, I am granting defendant's motion for summary judgment.

From the parties' proposed findings of fact, I find that the following facts are material and undisputed.

## UNDISPUTED FACTS

Plaintiff Cheryl Thoreson is a citizen of Minnesota. Defendant Woodside Ranch, LLC has two members: Damon Zumwalt, who is a citizen of Florida, and Steve Zumwalt, who is a citizen of Arkansas.

Defendant owns and operates Woodside Ranch, a resort and conference center located in Mauston, Wisconsin, where guests have the opportunity to participate in guided trail rides on horseback. One such trail ride takes place each morning and is known as the "breakfast ride." During the ride, guests are guided by ranch employees known as "wranglers" down wooded trails to a picnic area where the guests temporarily dismount, and breakfast is served. After breakfast, guests on the breakfast ride remount their horses and continue the trail ride to return to the area of the ranch from which the ride departed.

On May 23, 2007, plaintiff, her husband Keith Thoreson and her two friends Catherine Patterson and Gerald Johnson came to Woodside Ranch Resort and Conference

2

Center. While there, plaintiff and her husband went on multiple breakfast rides.

On the morning of May 26, 2007, plaintiff made her way to the barn area of the ranch to go on the breakfast ride. Patterson, Johnson and four wranglers employed by Woodside Ranch, including Samantha Nawrodt and Jessica Berg, also participated in the breakfast ride that day.

One of the job duties of wranglers at Woodside Ranch is to saddle the horses for trail rides. The saddles are then retightened before the horses are brought to a rail in the barnyard area. When plaintiff arrived at the barn area on May 26, 2007, the horses were already tied up to a rail and saddled. It was plaintiff's understanding that she could choose a horse to take on the trail ride from the horses tied to the rail.

Plaintiff told the wranglers that she was not an experienced rider and asked whether the horse she was contemplating was a good horse for her to ride. She selected a quarter pony named "Sorely" because he appeared smaller in stature than some of the other horses. Other than the time she spent at Woodside Ranch, plaintiff had no training or experience with horses or working with horse equipment and Woodside Ranch did not provide plaintiff instructions on riding the horse.

After mounting her pony, plaintiff believed she was not sitting up straight in the saddle but was leaning over to the right. As wranglers came by to inspect each person on their horse, plaintiff told a female wrangler, "My saddle is listing to the right." If a saddle

3

is leaning to one side and the cinch is not loose, a rider may be instructed by a wrangler to "right the saddle," which means to put weight on the opposite side to reposition the saddle. If the saddle was actually loose, wranglers would stop the ride and tighten the saddle. The wrangler told plaintiff to "stand up and right it," so she stood up, jostled the saddle over to the left with her pelvis and was then sitting straight. Plaintiff's husband had also noticed that his wife's saddle appeared loose and "off to the side," but after plaintiff stood up and repositioned her saddle, it looked to him as if the saddle was in the middle of the animal. Plaintiff and the other participants rode to the breakfast site without incident.

After breakfast, plaintiff mounted the same horse she had been riding earlier. She did not ask anyone about her saddle or complain about a problem with the saddle. Instead, she again "righted" the saddle by standing up and shifting her weight to reposition the saddle, thinking that was the normal thing to do with a saddle.

The horses were in a single-file line, "nose to tail," as the trail ride progressed from the breakfast site back to the ranch on a path through the woods. Plaintiff's horse was about fifth from the front and her husband was five or six horses behind her. During the ride back to the ranch, everyone stopped for about three minutes so that a guest behind plaintiff could switch horses, then the ride continued. The horses were at the speed of a walk, then plaintiff's horse started trotting to catch up. The saddle listed to the right again, and the horse began to move faster  The saddle shifted farther to the right, leaving her hanging on

4

the side of the horse for a few seconds with her left leg hung up on the saddle horn. Once her leg was freed, she fell to the ground. Plaintiff landed on the horse path and believes her left ankle was stepped on by another horse.

## OPINION

### A. Jurisdiction

Defendant removed this case from the Circuit Court for Juneau County, Wisconsin, relying on 28 U.S.C. § 1332 as a basis for jurisdiction. Under § 1332, defendant has the burden to show that complete diversity exists between the parties and that the amount in controversy is more than $75,000.

With respect to the amount in controversy, neither side attempts to put a specific dollar amount on the damages plaintiff suffered. Instead, defendant cites an answer to an interrogatory in which plaintiff refused to admit that her damages were less than $75,000. Dkt. #4-5. The Court of Appeals for the Seventh Circuit has stated that, "if the plaintiff does not stipulate to damages of $75,000 or less, the inference arises that he thinks his claim may be worth more." Oshana v. Coca-Cola Co., 472 F.3d 506, 512 (7th Cir. 2006). Further, because plaintiff alleges in the complaint that she suffered "severe physical injuries" and "emotional distress," I cannot say that "it is impossible for the plaintiff to recover the jurisdictional minimum," which is the standard I must apply. Back Doctors Ltd. v.

5

.

Metropolitan Property and Casualty Insurance Co., 637 F.3d 827, 829 (7th Cir. 2011).

With respect to diversity of citizenship, plaintiff is a citizen of Minnesota. Defendant has two individual members; one is a citizen of Florida and one is a citizen of Arkansas. Thus, diversity of citizenship exists between plaintiff and defendant.

A potential jurisdictional wrinkle is created because plaintiff included North Memorial Health Care Plan as an "involuntary plaintiff" in her complaint. The parties do not identify the plan's citizenship, but they agree in their proposed findings of fact that the plan "is not a citizen of Florida or Arkansas." The court of appeals addressed a similar representation in Wild v. Subscription Plus, Inc., 292 F.3d 526, 529 (7th Cir. 2002):

> In the plaintiffs' brief on appeal, Mutual is described as "a citizen of a state other than Louisiana, with its principal place [of business?] in a State other than Louisiana." But how can the plaintiffs know that the company's principal place of business is not in Louisiana if they don't know where its principal place of business is? We doubt that the plaintiffs conducted a census of all businesses whose principal place of business is in Louisiana and discovered that Mutual Fire and Automobile Insurance Company is not one of them.

Without facts showing the plan's state of citizenship, it is impossible to determine whether the plan destroys diversity. Thomas v. Guardsmark, LLC, 487 F.3d 531, 533 (7th Cir. 2007) (proponent of jurisdiction must identify the state of each party's citizenship). Generally, I would issue an order to show cause if the parties failed to establish complete diversity of citizenship. However, in this case, I can disregard the citizenship of the plan

6

because it is not a proper party to the case.

According to the complaint, plaintiff named the plan as an involuntary plaintiff under Wis. Stat. § 803.03 because the plan provided medical benefits to plaintiff related to the accident and is subrogated to plaintiff's rights. However, the use of "involuntary plaintiffs" in federal court is governed by Fed. R. Civ. P. 19. Under Rule 19(a)(2), "[a] person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff." I have noted that "[t]he use of Rule 19 in a federal case to join an involuntary plaintiff is rare." Elborough v. Evansville Community School District, 636 F. Supp. 2d 812, 826 (W.D. Wis. 2009). This is because a party who wishes to name an involuntary plaintiff must show that the absent party has refused to be joined as a plaintiff and is outside the court's jurisdiction. 7 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 1606, at 73 (3d ed. 2001) ("A party may be made an involuntary plaintiff only if the person is beyond the jurisdiction of the court, and is notified of the action, but refuses to join."). See also Murray v. Mississippi Farm Bureau Casualty Insurance Co., 251 F.R.D. 361, 364 (W.D. Wis.2008) ("Traditionally, a 'proper case' is one in which the involuntary plaintiff is outside the court's jurisdiction and is under some obligation to join the plaintiff's lawsuit but has refused to do so."). Plaintiff does not suggest that either of these possibilities applies to the plan.

A more fundamental problem is that the record does not show that plaintiff properly

joined the plan as a party. Counsel for the plan did not sign the complaint; plaintiff has not filed proof of service on the plan; and the plan has not made an appearance in the case. In fact, since defendant removed the case, it seems that both plaintiff and defendant have been proceeding as if the plan did not exist. Neither side has been serving court filings on the plan. Accordingly, I conclude that the plan is not a party to the case and that I need not determine the plan's citizenship. Jurisdiction is present under § 1332.

### B. Summary Judgment Standard

To succeed on a motion for summary judgment, the moving party must show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. V. Catrett, 477 U.S. 317, 322 (1986). In this case, defendant asserts that it is entitled to summary judgment because plaintiff's claim is barred by Wis. Stat. § 895.481, Wisconsin's statute creating a civil liability exemption related to equine activities.

Section 895.481(2) sets out the general scope of the statute:

> [A] person, including an equine activity sponsor or an equine professional, is immune from civil liability for acts or omissions related to his or her participation in equine activities if a person participating in the equine activity is injured or killed as a result of an inherent risk of equine activities.

Plaintiff admits that defendant is "an equine activity sponsor" within the meaning of this

provision. Plt.'s Br., dkt. #19, at 5. In addition, plaintiff does not argue that defendant's employees should be distinguished from defendant for the purpose of the statute.

> Section 895.481(3) sets out several exceptions to immunity:
>
> (3) The immunity under sub. (2) does not apply if the person seeking immunity does any of the following:
>
> (a) Provides equipment or tack that he or she knew or should have known was faulty and the faulty equipment or tack causes the injury or death.
>
> (b) Provides an equine to a person and fails to make a reasonable effort to determine the ability of the person to engage safely in an equine activity or to safely manage the particular equine provided based on the person's representations of his or her ability.
>
> (c) Fails to conspicuously post warning signs of a dangerous inconspicuous condition known to him or her on the property that he or she owns, leases, rents or is otherwise in lawful control of or possession.
>
> (d) Acts in a willful or wanton disregard for the safety of the person.
>
> (e) Intentionally causes the injury or death.

Plaintiff advances two reasons why defendant is not entitled to immunity: (1) her injury was not a result of the "inherent risk of equine activities" but instead was caused by defendant's negligence in failing to properly adjust plaintiff's saddle; and (2) defendant "[p]rovide[d] equipment or tack that [it] knew or should have known was faulty and the faulty equipment or tack cause[d] injury." Wis. Stat. § 895.481(3)(a). In addition, plaintiff cites § 895.481(3)(b), but her discussion of that provision is limited to less than one

9

sentence: "Mrs. Thoreson's fall and subsequent injuries were not the result of an 'inherent risk' of horseback riding, but faulty tack or equipment, and *the failure of the Defendants to safely manage the horse Cheryl Thoreson was riding*." Plt.'s Br., dkt. #19, at 6 (emphasis added). Because plaintiff has not developed this argument in any meaningful way, she has waived it. Campania Management Co., Inc. v. Rooks, Pitts & Poust, 290 F.3d 843, n. 6 (7th Cir. 2002) ("Perfunctory and undeveloped arguments are waived").

Defendant does not concede that it acted negligently. However, for the purpose of this motion, I will assume that plaintiff is correct that defendant was negligent in failing to properly adjust her saddle.

### C. Inherent Risk of Equine Activity

The statute includes the following definition of the phrase "inherent risk of equine activities":

> "Inherent risk of equine activities" means a danger or condition that is an integral part of equine activities, including all of the following:
>
> 1. The propensity of an equine to behave in a way that may result in injury or death to a person on or near it.
>
> 2. The unpredictability of an equine's reaction to a sound, movement or unfamiliar object, person or animal.
>
> 3. A collision with an object or another animal.

10

>4. The potential for a person participating in an equine activity to act in a negligent manner, to fail to control the equine or to not act within his or her ability.
>
>5. Natural hazards, including surface and subsurface conditions.

Wis. Stat. § 895.481(1)(e). The parties focus on the fourth example of an "inherent risk." In particular, the question is whether an employee of defendant is a "person participating in an equine activity" in the context of this case. If defendant's employee is considered a "person participating," then that negligence is an inherent risk of equine activity under § 895.481(1)(e)4. The statute does not define the term and Wisconsin courts have not yet had an opportunity to construe it.

The goal of statutory interpretation in Wisconsin is to give effect to the intent of the legislature. State Dept. of Natural Resources v. City of Waukesha, 184 Wis. 2d 178, 189, 515 N.W.2d 888 (1994). Wisconsin presumes that the plain meaning of a statute is the best indicator of the legislature's intent. Id. Accordingly, if a statute is clear and unambiguous on its face, the court need look no further and must apply the statutory language as it is written. Id. In the absence of a statutory definition, words of a statute are to be construed according to their common and approved usage. N.E.M. by Kryshak v. Strigel, 208 Wis. 2d 1, 8, 559 N.W.2d 256 (1997). A court may use a dictionary to determine the common and approved usage of words appearing in a statute. Id.

Plaintiff argues that "a person participating in an equine activity" encompasses only

11

"the rider of the horse." Plt.'s Br., dkt. #19, at 8. Although she does not explain this point, presumably she means to say that this provision is limited to the negligence of the *injured* rider or perhaps to other customers. This view has some support in the language of the statute if one looks only at the other examples of "inherent risks of equine activity" listed in § 895.481(1)(e). These include the surrounding environment and the unpredictable behavior of the horse. It might be argued that these examples are matters that generally are outside the immediate control of the sponsor, unlike the conduct of sponsor employees, and that the meaning of "participa[nt]" should be limited to individuals such as customers that are similarly outside the sponsor's control. Cf. Hall Street Associates, LLC v. Mattel, Inc., 552 U.S. 576, 586 (2008) ("When a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows.").

This argument falls apart when considered in the context of the statute as a whole. Martine v. Williams, 2011 WI App 68, ¶ 20, 333 Wis. 2d 203, 212, 799 N.W.2d 449, 453-54 ("We construe statutory language in the context within which it is used, not in isolation but as part of a whole.") (internal quotations omitted). First, § 895.481(2) provides immunity to any "person . . .related to his or participation in equine activities" and includes "an equine activity sponsor" within the meaning of "person." This language is strong evidence that "a person participating in an equine activity" may include the sponsor. There

12

would be no point in giving a sponsor immunity for its "participation in equine activities" unless sponsors actually did participate in those activities under some circumstances. Cook v. Industrial Commission, 31 Wis. 2d 232, 240, 142 N.W.2d 827, 831 (1966) ("[S]tatutes should be so construed that no word or clause shall be rendered surplusage.").

Second, under § 895.481(3m), "[a] person whose only involvement in an equine activity is as a spectator shall not be considered to be participating in the equine activity." This provision suggests that a court must determine on a case-by-case basis whether a particular person was "participating." In other words, the important question is not whether the person is a customer or an employee, but the extent to which the person was involved in the particular activity.

Third, the statute defines "equine activity" to include "training," "teaching" and "assisting" other riders as well as "inspecting" and "evaluating" another's horse. Wis. Stat. § 895.481(1)(b). Obviously, the injured rider would not be "assisting" herself and it would be rare for other customers to be involved in training or teaching. Rather, these are activities that ordinarily would be performed by the sponsor. Accordingly, I conclude that a "person participating in an equine activity" may include the sponsor and its employees.

In this case, plaintiff alleges that she was injured as a result of the negligence of employees who were responsible for supervising the horseback ride. These employees participated by preparing the horses, riding along with the customers on the trail and giving

13

instructions. The employees could not be called "spectators" under any reasonable view of that word. Rather, they were teaching and assisting plaintiff during her ride.

Although Wisconsin courts have yet to determine whether sponsor negligence is one of the inherent risks of equine activity, other jurisdictions have. The Texas equine immunity statute defines "inherent risk" to mean "'the potential of a participant to act in a negligent manner that may contribute to the injury to the participant or another.'" The Texas Supreme Court concluded that that definition "refut[ed] the argument that sponsor negligence is not an inherent risk of equine activity." Loftin v. Lee, 341 S.W. 3d 352, 357 (Tex. 2010).

The Loftin case also addresses plaintiff's argument that the immunity applies only "to the unpredictable nature of equine behavior, unpredictable condition of others, and certain natural hazards." Plt.'s Br., dkt. #19, at 8. The plaintiff in Loftin, 341 S.W.3d at 358, asserted similar arguments. The court responded:

> The Act simply cannot be fairly read to limit inherent risks to those which are unavoidably associated with equine behavior. Construed so narrowly, the Act would accomplish nothing. The common law does not impose liability on a person for injury caused by a domestic animal, like those covered by the Act, unless the animal was abnormally dangerous and the person had reason to know it, or the person was negligent in handling the animal. It would have been pointless for the Legislature to limit liability when none existed. We must presume that the Legislature intended more.

As in Loftin, limiting the inherent risks so strictly in this case would circumvent the intent

14

of the legislature.

The Court of Appeals for the Tenth Circuit examined whether a loosely cinched saddle slipping is an inherent risk of horseback riding, deciding that it was. Cooperman v. David, 214 F.3d 1162 (10th Cir. 2000). The court stated that because "cinching a saddle is done by hand, and not with scientific precision, a provider must make a judgment call as to how tight or loose to cinch the saddle. This imprecision in the cinching of the saddle is 'characteristic' or 'typical' of and therefore 'inherent in' the sport of horseback riding."

Accordingly, I conclude that an "inherent risk of equine activities" may include the negligence of a sponsor's employees and that the employees in this case were "person[s] participating in an equine activity."

### D. Faulty Equipment

In the alternative, plaintiff argues that defendant's behavior falls into a statutory exception to immunity. Specifically, plaintiff says that defendant's alleged failure to properly adjust her saddle falls within Wis. Stat. § 895.481(3)(c), under which a defendant is not immune if it "provides equipment or tack that [it] knew or should have known was faulty and the faulty equipment or tack causes the injury or death."

Plaintiff's argument is not persuasive for multiple reasons. First, plaintiff is not arguing that the saddle she used was defective in any way. Rather, she says that the saddle

15

"was too lose, and inappropriately placed, inspected, tightened or adjusted." Plt.'s Br., dkt. #19, at 6. The statue creates an exception for "faulty equipment," not for "faulty handling of equipment." Plaintiff is asking the court to rewrite the statute, which I cannot do. Second, because I have concluded that the statute covers the negligence of sponsors who are assisting customers, it would make little sense to interpret one of the exceptions as applying to the same conduct.

Wisconsin courts have yet to interpret the faulty equipment exception, but the New Jersey Supreme Court recently rejected an argument like plaintiff's, stating that "the statutory exception must refer to equipment that is itself faulty. . . We decline to read the 'faulty equipment' exception so that it encompasses equipment in good working order. . ." Hubner v. Spring Valley Equestrian Center, 1 A.3d 618, 631 (N.J. 2010). That conclusion is a persuasive one.

Plaintiff relies on two cases: Zuckerman v. Coastal, 716 F. Supp. 2d 23 (D. Me. 2010) and Steeg v. Baskin Family Camps, Inc., 124 S.W.2d 633 (Tex. Ct. App. 2003). In Zuckerman, 716 F.Supp.2d at 33, the federal district court in Maine found two definitions of "faulty" in the dictionary: "marked by a fault: having a fault, blemish, or defect" and "not fit for the use or result intended." The court decided that "if [defendant] used a girth that was wrong for [the horse], given her weight and shape, and if fleece-lined girths are more prone to slippage than other types, the girth could fit within the second definition of the

16

term 'faulty.'" Id.

Zuckerman does not help plaintiff. Even under the Maine court's second definition, plaintiff's saddle would not be considered "faulty." As defendant points out, plaintiff has not alleged that the equipment was not fit for the use or result intended. She is not arguing that defendant chose the wrong type of saddle, only that defendant was negligent in adjusting the saddle.

In Steeg, 124 S.W. 2d at 640, the court reversed the trial court's order granting summary judgment to defendant because the record did not clearly establish that the acts or omissions were part of the inherent risk of equine activity. However, Steeg does not help plaintiff because the court did not consider the scope of any of the exceptions to immunity. Id. at 640 ("Because appellee has not shown as a matter of law that it is immune from liability, we need not review Steeg's challenges to the court's rejection of the immunity exceptions. . . ."). In addition, in Loftin, 341 S.W.3d 352, the Texas Supreme Court disapproved of the Steeg decision, so its precedential value is limited. Id. at 357 (holding that Steeg wrongly concluded that "[t]he Act denies immunity from liability for factors essentially within the sponsors' control.")

The cases that plaintiff relies on to show defendant is not entitled to immunity are either not on point or not authoritative. I find the New Jersey Supreme Court's interpretation in Hubner most persuasive. Accordingly, I conclude that the term "faulty

17

equipment" in Wis. Stat. § 895.481(3)(c) does not include negligent handling of equipment in good working order.

Even if I view the facts in the light most favorable to plaintiff, the equine immunity statute applies to the injuries plaintiff received and no exception to immunity exists. Therefore, the defendant's motion for summary judgment must be granted.

ORDER

IT IS ORDERED that defendant Woodside Ranch, LLC's motion for summary judgment, dkt. #14, is GRANTED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 2d day of December, 2011.

BY THE COURT:
/s/
Barbara B. Crabb
District Judge